THOMAS P. SCIFO AND AURORA SCIFO, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

LEWIS P. SCIFO AND NORMA E. SCIFO, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6788–75—6789–75. Filed August 23, 1977.

*Gene F. Reardon,* for the petitioners.
*Jeff P. Ehrlich,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioners' 1970 income tax liability as follows:

| Docket No. | Petitioners | Deficiency |
|---|---|---|
| 6788–75 | Thomas P. Scifo and Aurora Scifo......... | $22,776 |
| 6789–75 | Lewis P. Scifo and Norma E. Scifo........ | 22,634 |

The issues raised in these consolidated cases require us to decide:

(1) Whether a payment by petitioners, as guarantors of a corporate note, gives rise to a business or nonbusiness bad debt deduction under section 166, I.R.C. 1954;[1]

(2) Whether Thomas P. Scifo and Lewis P. Scifo, as individuals, were the owners of certain World Foods Corp. stock, and if so, whether that stock became worthless in 1970 so that petitioners are entitled to deduct the losses claimed in respect of the stock; and

(3) Whether petitioners' investment in Scifo Enterprises, Ltd., became worthless in 1970 so as to entitle petitioners to deductions therefor.[2]

### FINDINGS OF FACT

A few of the facts have been stipulated and are accordingly so found.

Thomas P. Scifo and Aurora Scifo, petitioners in docket No. 6788–75, and Lewis P. Scifo and Norma E. Scifo, petitioners in docket No. 6789–75, are in each case husband and wife and at the time of the filing of the petitions herein, resided in Parker, Colo., and Littleton, Colo., respectively. Each couple filed its joint income tax return for 1970 with the Austin Service Center, Austin, Tex.

Thomas P. Scifo and Lewis P. Scifo (hereinafter referred to as petitioners) are brothers. At all times material herein, petitioners each owned one-half of the capital stock of Scifo

---

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect in the year in issue.

[2] A finding for petitioners on this issue will in each case result in an overpayment of tax for 1970 and accordingly entitle petitioners to a refund.

Enterprises, Ltd., which was incorporated in April 1969.[3] Thomas was president of Scifo Enterprises, Ltd., and Lewis was its vice president.

Prior to 1970, the year in issue, petitioners had been involved in the organization and operation of Mr. Steak, Inc., a corporation engaged in the fast-food business. After Mr. Steak went public in 1969, petitioners sold their stock, terminated their involvement in the business, and began to look for other investment and employment opportunities. They each realized a large capital gain on the sale of their stock in Mr. Steak.

World Foods Corp. (World Foods) was a corporation engaged in the convenience foods business whose founder and president, Rolf Ruppenthal, was a business acquaintance of Lewis Scifo. The minutes of the World Foods board of directors meeting held on October 18, 1969, report:

NEW EQUITY CAPITAL INVESTMENT

Mr. Ruppenthal then presented to the Board an offer from Mr. Lewis P. Scifo and Mr. Thomas Scifo to jointly purchase 100,000 shares of World Foods Corporation common stock at the price of $2.50 per share. A motion was made by Mr. Cohig and seconded by Mr. Schultz that World Foods Corporation accept the Scifo Brothers' offer to purchase 100,000 shares of lettered common stock of World Foods Corporation, at $2.50 per share, said purchase to be effected by five payments of $50,000 each. These payments are to be made to World Foods Corporation on November 15, 1969, December 30, 1969, February 28, 1970, April 30, 1970 and June 30, 1970. A three year option to purchase an additional 50,000 shares of lettered common stock in World Foods Corporation at $2.50 per share is also to be granted to the Scifo Brothers. In addition, a letter is to be provided to the Scifos promising that the Board of Directors will approve the inclusion of their stock in any subsequent stock registration of this Company. This motion was passed unanimously by all Directors present. * * *

By letter dated November 20, 1969, the secretary-treasurer of World Foods directed its transfer agent to issue a stock certificate for 20,000 shares to D. S. Investments, Inc.[4] Thereafter, by letters dated February 18, 1970, and April 2, 1970, the transfer agent was, in each letter, instructed to issue a 20,000-share certificate to Scifo Enterprises, Ltd. Each

---

[3] Scifo Enterprises, Ltd., was incorporated under the name of D. S. Investments Co. As evidenced by its initial income tax return (Form 1120), the name change was effected prior to the close of its taxable year ended Jan. 31, 1970.

[4] See n. 3 *supra.*

20,000-share purchase was paid for by a check for $50,000 written by Scifo Enterprises, Ltd.

The cost of the first 20,000 shares ($50,000) was included in the $129,905 reported as "other investments" on Schedule L (balance sheets) of the U. S. Corporation Income Tax Return (Form 1120) filed by Scifo Enterprises, Ltd., for the taxable year ending January 31, 1970. The total cost of the 60,000 shares was initially carried on the books of Scifo Enterprises, Ltd., as "Investment—World Foods." An adjusting journal entry was made as of January 31, 1971, by which the $150,000 was charged against the notes payable to petitioners. Schedule L of the return filed by Scifo Enterprises, Ltd., for the taxable year ending January 31, 1971, reports "other investments" at the beginning and end of the year in the respective amounts of $129,905 and $79,905.[5]

On the list of World Foods shareholders as of September 10, 1970, and as of January 17, 1971, Scifo Enterprises, Ltd., appears as the record owner of 60,000 shares.[6]

During the fall of 1970, World Foods encountered financial difficulties.[7] On October 9, 1970, World Foods filed a petition pursuant to Chapter XI of the Bankruptcy Act. The financial situation of World Foods was the topic of the special meeting of shareholders held December 21, 1970, at which the shareholders approved an increase in the authorized shares from 500,000 to 1 million shares and ratified a certain financial agreement relating to the bankruptcy proceedings. On February 2, 1971, World Foods was adjudicated a bankrupt for purposes of liquidation.

Sometime in 1970, Lewis and Thomas Scifo each paid $12,500 pursuant to their obligation as guarantors of a bank loan received by World Foods. Neither petitioner ever received a salary from World Foods nor entered into an employment contract with World Foods, although the minutes of the World Foods annual shareholders' meeting indicate

---

[5] The $79,905 represents the stock interest in its subsidiary Parker City Land Co., discussed infra.

[6] On both lists, Lewis P. Scifo appears as the record owner of 8 shares.

[7] The record is somewhat vague as to exactly what transpired, but apparently during this period of financial crisis, the Internal Revenue Service caused World Foods to cease operations.

that as of that date, October 3, 1970, Lewis Scifo was chairman of the board.

Apart from the World Foods stock carried on its books until the aforementioned adjustment, as of December 31, 1970,[8] the major assets of Scifo Enterprises, Ltd., were Devonshire House, a 120-unit apartment building in Denver, Colo., and a controlling[9] stock interest in Parker City Land Co.

Devonshire House had been acquired in 1969 at a cost of approximately $1.9 million. As of the close of 1970, Devonshire House had a value in excess of $1.7 million and was subject to mortgages totaling $1.4 to $1.5 million. Devonshire House operated at a loss from its acquisition until mid-1971 when it was sold for slightly more than $1.7 million.[10]

Parker City Land Co. (Parker), incorporated in 1969, was formed to invest in certain land in Parker City, Colo., that it intended to develop for commercial use. Petitioners were among the principals in Parker's formation and operation.[11] Sometime in 1970, after some of the land contracts had been entered into on behalf of Parker (on many, if not all, of which petitioners were personally liable), petitioners found that a flood plain problem, as well as certain zoning, water, and sewer requirements, prevented realization of Parker's original plan unless accompanied by extensive land development. Beginning in 1971 Parker embarked on an expanded development plan; as of the close of 1970, the project was still in its initial stages. Parker's financial status is reflected in the following table which summarizes the balance sheet information reported on Schedule L of Parker's income tax return for each of its taxable years 1970, 1972, 1973, 1974, and 1975:[12]

---

[8] Although Scifo Enterprises, Ltd.'s fiscal year did not end until Jan. 31, 1971, the parties agree that the returns and records as of Jan. 31, 1971, accurately reflect the corporation's financial status as of Dec. 30, 1970.

[9] The ownership interest is variously referred to as 77 percent (at trial) and 72 percent (income tax returns for fiscal 1970 and 1971); the exact percentage is not material to the issues considered herein.

[10] On its return for fiscal 1972, Scifo Enterprises, Ltd., reported a loss of $76,509 arising from the sale of Devonshire House.

[11] Thomas Scifo was president of Parker and Lewis Scifo served as vice president. Thomas received and reported on his income tax returns compensation from Parker in each of the years 1971, 1972, and 1973; similarly, Lewis received and reported compensation from Parker in 1972 and 1973.

[12] Parker filed no return for the taxable year ended Jan. 31, 1971. The figures

| As of: | 1/31/70 | 1/31/71 | 1/31/72 | 1/31/73 | 1/31/74 | 1/31/75 |
|---|---|---|---|---|---|---|
| TOTAL ASSETS .......... | $293,776 | $783,655 | $2,147,992 | $8,912,623 | $15,907,326 | $17,334,211 |
| Including: | | | | | | |
| Accounts receivable (net)... | 1,161 | 8,742 | 523,636 | 124,767 | 1,085,718 | 875,603 |
| Inventories[1] ......... | 25,863 | 29,343 | | 1,331,733 | 5,192,425 | 6,769,095 |
| Buildings and fixed assets (net of depreciation)..... | 153,098 | 291,207 | 263,035 | 452,514 | 1,177,424 | 1,165,939 |
| Land....................... | 103,871 | 319,651 | 996,880 | 354,988 | 4,502,995 | 4,447,995 |
| Other assets (including development costs, land in process and land contracts) ... | 1,691 | 106,078 | 342,619 | 5,941,964 | 8,825,695 | 3,941,448 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY ................... | 293,776 | 783,655 | 2,147,992 | 8,912,623 | 15,907,326 | 17,334,211 |
| Including: | | | | | | |
| Total current liabilities .......... | 34,856 | 229,440 | 801,787 | 2,942,545 | 4,087,351 | 4,777,497 |
| Loans from stockholders...... | 6,000 | 164,670 | 413,168 | 285,886 | 282,347 | 375,473 |
| Mortgages, notes, bonds payable in 1 year or more................... | 134,640 | 256,669 | 699,572 | 5,794,265 | 13,651,030 | 14,917,474 |
| Other liabilities ... | | | 17,902 | 294,997 | 423,457 | 289,803 |
| Capital stock (common).......... | 124,000 | 173,000 | 188,000 | 272,000 | 272,000 | 272,000 |
| Retained earnings............. | (5,720) | (40,124) | 27,563 | (677,071) | (2,808,859) | (3,298,036) |

[1] At least for fiscal 1973, this category is specified to include "Developed Land Held for Current Sale."

As of mid-1975, Parker was in bankruptcy proceedings under Chapter XI.

The balance sheet information reported by Scifo Enterprises, Ltd., on Schedule L of its respective income tax returns for each of its fiscal years 1970 through 1974 is summarized below:

which we have used for that date are those reported under "Beginning of taxable year" on Schedule L of Parker's return for the taxable year ended Jan. 31, 1972.

| As of: | 1/31/70 | 1/31/71 | 1/31/72 | 1/31/73 | 1/31/74 |
|---|---|---|---|---|---|
| TOTAL ASSETS | $2,209,905 | $2,031,541 | $297,148 | $91,498 | $3,075 |
| Including: | | | | | |
| Accounts receivable (net) | | 108,159 | 136,145 | 14,139 | |
| Loans to stockholders | 600 | | 30,175 | 28,775 | |
| Other investments | 129,905 | 79,905 | 130,253 | [1] | |
| Buildings and fixed assets (net of depreciation) | 1,766,119 | 1,714,246 | 575 | 575 | 575 |
| Land | 126,208 | 126,208 | | | |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | 2,209,905 | 2,031,541 | 297,148 | 91,498 | 3,075 |
| Including: | | | | | |
| Total current liabilities | 556,215 | 487,962 | 10,073 | 1,654 | 31,654 |
| Loans from stockholders | | | 293,962 | 178,506 | 13,015 |
| Mortgages, notes, bonds payable in 1 year or more | 1,487,339 | 1,457,878 | | | |
| Capital stock (common) | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 |
| Retained earnings | 41,351 | (39,299) | (131,887) | (213,662) | (166,594) |

[1] Schedule M–1 (Reconciliation of Income with Income Per Return) of the return for fiscal 1973 reports a $130,252 "loss from unconsolidated subsidiary" that was recorded on the books but not deducted on the return.

As of January 31, 1971, petitioners had advanced to Scifo Enterprises, Ltd., a total of $300,662, which amount is reported on Schedule L as current liabilities rather than as "Loans from Shareholders." On the subsequent Schedules L petitioners' advances are reflected as "Loans from Shareholders."

Lewis Scifo reported on his return for 1970 wages of $2,000 and a bonus of $25,000 from Scifo Enterprises, Ltd.; Thomas Scifo reported for 1970 wages of $1,000 and a bonus of $25,000 from Scifo Enterprises, Ltd. Thereafter, neither petitioner reported compensation from Scifo Enterprises, Ltd., nor was any amount claimed as compensation of officers on the corporation's income tax returns. In March 1974, Scifo

Enterprises, Ltd., was liquidated pursuant to a plan adopted in accordance with section 333.

On Schedule D (Sales or Exchanges of Property) of his return for 1970, Lewis Scifo claimed a short-term[13] capital loss of $87,500 designated "Worthless Stock—World of Foods." Lewis Scifo also reported a long-term capital gain of $230,565 on the sale of stock in Mr. Steak. On Schedule D of his return for 1970, Thomas Scifo claimed a short-term[14] capital loss of $87,500 designated "Worthless Stock—World of Foods." Thomas Scifo also reported a long-term capital gain of $276,383 on the sale of Mr. Steak stock.

The respective statutory notices issued to petitioners on May 8, 1975, each state in the "Explanation of Adjustments" that:

In 1970 you claimed a $87,500 short term capital loss consisting of a $75,000.00 worthless stock loss in World Foods, Inc., and a $12,500.00 nonbusiness bad debt in World Foods, Inc. It has not been established that you were the owner of this stock; therefore your capital gain is increased in the amount of $75,000.00. * * *

### ULTIMATE FINDINGS OF FACT

Petitioners were the owners of 60,000 shares (30,000 each) of the capital stock of World Foods, Inc., as of December 31, 1970.

The stock of World Foods, Inc., was worthless as of December 31, 1970.

Petitioners' investments in Scifo Enterprises, Ltd., were not worthless as of December 31, 1970.

### OPINION

The facts in this case reflect the unfortunate experience of the Scifo brothers who apparently worked diligently and successfully to promote the business of a corporation called "Mr. Steak" to a point where they each realized about $700,000 on the sale of their stock in that corporation in 1969 and 1970 and within a few years thereafter lost it all through investments in real estate and other ventures in which they had had no prior experience. While their subsequent invest-

---

[13] Neither the date acquired nor the date sold is provided, although with respect to the Mr. Steak stock, both the year acquired and year sold are stated.

[14] See n. 13 *supra*.

ments went bad in a relatively short time the question is whether they became worthless in time for petitioners to offset their losses against their gains on the sale of their stock in Mr. Steak.

In 1970, petitioners Lewis and Thomas Scifo each paid $12,500 pursuant to their personal guarantee of a bank loan to World Foods, Inc., and included that amount in the $87,500 short-term capital loss that each claimed on his respective income tax return for 1970. Petitioners now contend that the loss arising from the guarantee constitutes a business debt within the ambit of section 166(a);[15] hence, ordinary in character. Respondent maintains that petitioners' loss was a nonbusiness debt deductible under section 166(d)[16] and as such a short-term capital loss as originally claimed.[17] We agree with respondent.

---

[15] SEC. 166. BAD DEBTS.

(a) GENERAL RULE.—

(1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

(2) PARTIALLY WORTHLESS DEBTS.—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

[16] Sec. 166(d) NONBUSINESS DEBTS.—

(1) GENERAL RULE.—In the case of a taxpayer other than a corporation—

(A) subsections (a) and (c) shall not apply to any nonbusiness debt; and

(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.

(2) NONBUSINESS DEBT DEFINED.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—

(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

(Sec. 166(d)(1) was amended Oct. 4, 1976, by sec. 1402(b)(1) of Pub. L. 94–455.)

See also sec. 1.166–8, Income Tax Regs., which in pertinent part provides:

Sec. 1.166–8. Losses of guarantors, endorsers, and indemnitors.

(b) *Corporate obligations.* The loss sustained during the taxable year by a taxpayer other than a corporation in discharge of all of his obligation as a guarantor of an obligation issued by a corporation shall be treated, in accordance with section 166(d) and the regulations thereunder, as a loss sustained on the worthlessness of a nonbusiness debt if the debt created in the guarantor's favor as a result of the payment does not come within the exceptions prescribed by section 166(d)(2)(A) or (B).
* * *

[17] In view of the fact that the statutory notices allowed the bad debt deductions claimed, albeit as nonbusiness debts, respondent does not, for purposes of this issue, challenge the worthlessness of World Foods.

It is well recognized that a taxpayer may establish the requisite business nexus for deductibility of a bad debt under section 166(a) by proof that his dominant motivation in incurring the debt was to protect his employment. *United States v. Generes,* 405 U.S. 93 (1972); *Shinefeld v. Commissioner,* 65 T.C. 1092 (1976). Petitioners in the instant case have failed to establish the threshold criterion upon which their argument depends; quite simply, petitioners had no employment with World Foods to protect. As respondent points out, petitioners received no compensation from World Foods nor had they entered into employment contracts with World Foods. The only evidence of services performed by either petitioner is the fact that as of October 1970, Lewis Scifo was chairman of the board of directors of World Foods. In view of these factors, we find no support for petitioners' assertions that their primary motive in guaranteeing the bank loan was to protect their jobs. Moreover, there may have been some informal understanding as to the services petitioners might perform, but petitioners have not proved that any such understanding created an existing employment relation rather than a mere expectation thereof.

Instead, we believe that in guaranteeing the loan, petitioners were acting in their interests as investors rather than employees. See *United States v. Generes, supra.* Regardless of whether petitioners owned the World Foods stock directly or indirectly, which issue is discussed *infra,* petitioners had a substantial investment interest ($150,000) that, more realistically, provided a predominantly nonbusiness motivation.

As said by the Supreme Court in *United States v. Generes, supra* at 107: "We conclude on these facts that the taxpayer's explanation falls of its own weight, and that reasonable minds could not ascribe, on this record, a dominant motivation directed to the preservation of the taxpayer's salary" (not even present here) as an employee of World Foods. Accordingly, we hold that the respective bad debt deductions to which petitioners are entitled[18] are nonbusiness in character and as such, were properly deducted by petitioners as short-term capital losses.

---

[18] Pursuant to respondent's concession, see n. 17 *supra.*

We must next decide whether petitioners are entitled to the deductions claimed for worthless stock in World Foods. Resolution of this issue requires us to decide, as a threshold matter, whether the 60,000 shares of World Foods were owned by petitioners individually, as petitioners maintain, or whether such stock was, as respondent contends, owned by Scifo Enterprises, Ltd. We think that the precise question of who initially purchased the stock is a close one. While we are inclined to regard petitioners as having been the owners of the World Foods stock from the outset as well, we conclude that petitioners were the owners of the World Foods stock as of the close of 1970.

While we recognize that the letters to the stock transfer agent, the checks from Scifo Enterprises, Ltd., the World Foods shareholder lists, as well as the initial treatment of the first 20,000 shares by Scifo Enterprises, Ltd., constitute evidence which tends to support respondent's position, the evidence does not reflect the circumstances under which the stock may have been initially issued in the name of Scifo Enterprises, Ltd. The stock certificates and stock transfer books were not available and Lewis Scifo testified that the only time he saw a stock certificate he refused to accept it because it was issued in the wrong name. We think that petitioners' characterization more accurately reflects the intention of the parties involved in the World Foods investment.

Both petitioners testified that they formed Scifo Enterprises, Inc. (D. & S. Investments Co., which had another stockholder, until the latter part of 1969), to hold their real estate investments only and that their investment in World Foods, a business with which they were familiar, was intended to be personal. Rolf Ruppenthal, president of World Foods and with whom petitioners discussed the prospect of an investment in World Foods, testified that it was his understanding that any investment by petitioners was to be a personal investment and that had he thought otherwise, he would have submitted a proposal different from that presented to the board of directors on October 18, 1969. Indeed, by such language as—"an offer from Mr. Lewis P. Scifo and Mr. Thomas Scifo to jointly purchase," "the Scifo Brothers' offer to purchase," "An option * * * is also to be granted to the

Scifo Brothers," and "a letter * * * to the Scifos"—the minutes of that board meeting corroborate his understanding. In a letter dated October 12, 1973, to Lewis P. Scifo, Rolf Ruppenthal, president of World Foods, said, "however, I can verify that $150,000 in equity capital was invested by you and your brother" in World Foods. Further we regard the adjusting journal entries, whereby the World Foods stock was removed from Scifo Enterprises, Ltd.'s books and applied in reduction of its indebtedness to petitioners, as either a correction[19] necessary to conform the investment to the intended direct ownership by petitioners, or, assuming arguendo that the World Foods stock was initially owned by Scifo Enterprises, Ltd., as evidence of a bona fide exchange pursuant to which petitioners acquired direct ownership of the stock.[20]

Having thus found that as of the close of 1970, petitioners, as individuals, were the owners of the World Foods stock in issue, we now proceed to the question of whether that stock became worthless in 1970 so as to entitle petitioners to the respective deductions claimed therefor.

Section 165(g) provides in pertinent part:

(g) WORTHLESS SECURITIES.—
    (1) GENERAL RULE.—If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.

As further specified in the regulations "A mere shrinkage in the value of stock owned by the taxpayer, even though extensive, does not give rise to a deduction under section 165(a) if the stock has any recognizable value on the date claimed as the date of loss." Sec. 1.165–4(a), Income Tax Regs. Instead, the burden is on the taxpayer to establish "identifiable events" from which we may conclude that stock has become worthless. *Boehm v. Commissioner*, 326 U.S. 287

---

[19] No formal books and records were kept by Scifo Enterprises, Ltd., prior to the fall of 1970 when a C.P.A. was hired to perform this task, inter alia.

[20] We recognize that the adjusting entries in the books made at a time when World Foods was in precarious financial straits smacks of tax planning, but that is only one factor to take into consideration in determining the ownership of the stock. The capital invested in World Foods was clearly supplied by the Scifo brothers.

(1945). As stated in *Morton v. Commissioner*, 38 B.T.A. 1270, 1278–1279 (1938), affd. 112 F.2d 320 (7th Cir. 1940):

stock may not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, and * * * such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called "identifiable" in that they are likely to be immediately known by everyone having an interest by way of stockholdings or otherwise in the affairs of the corporation; but, regardless of the adjective used to describe them, they are important for tax purposes because they limit or destroy the potential value of stock.

The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If the assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation.

In the instant case, the record contains rather sparse evidence as to the financial condition of World Foods, which is somewhat understandable in that petitioners were never the controlling stockholders of World Foods and possession of all the records of that company was apparently taken by the trustee in bankruptcy early in 1971. The founder and president of World Foods until the fall of 1970 testified that in his opinion the stock of World Foods was worthless by the end of 1970, as did the former secretary-treasurer of the company. Ruppenthal testified that not long after the additional capital was put into the company by the Scifo brothers, the company experienced a strike by its employees which lasted over 3 months and that the strike destroyed the company. The record does reveal that World Foods filed a petition in bankruptcy in October of 1970 and was adjudicated bankrupt February 2, 1971. Also the Internal Revenue Service caused the corporation's plant to be closed down in the fall of 1970 and it was never reopened. These are identifiable events which occurred in 1970 and which would form the basis of

reasonable grounds for abandoning hope of recovery in that year. See *Estate of Pachella v. Commissioner,* 37 T.C. 347 (1961), affd. 310 F.2d 815 (3d Cir. 1962); *Steadman v. Commissioner,* 50 T.C. 369 (1968), affd. 424 F.2d 1 (6th Cir. 1970).

The above factors, coupled with the fact that respondent in his notice of deficiency allowed petitioners' loss on the guarantee of World Foods' obligation to a bank as a nonbusiness bad debt in 1970 and made no determination that the stock was not worthless in 1970, convince us that only the "eternal optimist" (see *United States v. S.S. White Dental Mfg. Co.,* 274 U.S. 398 (1927)), would have thought that the corporation had any present value or future potential as of December 31, 1970. The fact that the stockholders of World Foods authorized an increase in its capital stock at a meeting held on December 21, 1970, does not change our conviction; that was probably a last desperate effort to keep the corporation afloat by the infusion of additional capital but there is no indication that the additional stock authorized found any buyers.

We conclude that the stock of World Foods was worthless as of December 31, 1970, and that petitioners were entitled to a deduction of a long-term capital loss for their $150,000 ($75,000 each) investment therein for the year 1970.

While we assume that petitioners' claim, first raised by an amendment to their petitions filed at the commencement of the trial, that their investments in Scifo Enterprises, Ltd., also were worthless as of December 31, 1970, was in the alternative in the event we concluded that Scifo Enterprises, Ltd., owned the World Foods stock, to avoid any uncertainty on that score we have considered that claim in the light of the evidence presented and have concluded that petitioners have not proved that their investments[21] in Scifo Enterprises, Ltd., became worthless in 1970 so as to entitle them to deductions therefor.

The record reveals no "identifiable events" to support petitioners' position. Although Scifo Enterprises, Ltd., may

---

[21] By investments, petitioners refer to both their total $125,000 equity in Scifo Enterprises, Ltd., and the $300,662 of advances treated as debt, rather than capital contribution.

have begun to encounter some financial difficulties, as evidenced by the $39,299 deficit in retained earnings reported on its Schedule L for the taxable year ended January 31, 1971, we do not conclude, as petitioners urge, that the corporation was insolvent. We note that Scifo Enterprises, Ltd., was not in fact liquidated until 1974 and that, as of the close of 1970, it still had both its principal assets—Devonshire House and its stock interest in Parker City.

In essence, petitioners have attempted to establish the insolvency of Scifo Enterprises, Ltd., by showing that these two assets had no value at the end of the year in issue. Petitioners emphasize that Devonshire House produced a negative cash flow. We note, however, that at the end of 1970, the value of the property exceeded the mortgages held on it. The fact that the sale of Devonshire House in 1971 generated a loss for tax purposes does not mean that it was a worthless asset at the end of 1970.

Similarly, notwithstanding petitioners' repeated testimony to the effect that Parker City was a losing proposition, we cannot conclude therefrom that Scifo Enterprises, Ltd.'s controlling interest in Parker City was worthless by the end of 1970. At that time, Parker City was only in the initial stages of its development activities, as evidenced by the increasing amounts of both assets and liabilities reflected on the Schedules L of its income tax returns for the years after fiscal 1971. The fact that the stock interest in Parker City was not written off by Scifo Enterprises, Ltd., until sometime after January 31, 1972, militates strongly against a finding that the Parker City stock became worthless as early as 1970.

As further evidence that petitioners' investment in Scifo Enterprises had not become worthless in 1970, we note that petitioners apparently did in fact receive a return of their advances. As of January 31, 1971, petitioners' advances to Scifo Enterprises, Ltd., totaled $300,662. By January 31, 1972, this amount was reduced to $293,962, which amount was further reduced to $178,506 as of January 31, 1973, and to $13,015 as of January 31, 1974. Petitioners' position is further undermined by the fact that, in addition to their respective salaries from Scifo Enterprises, Ltd., petitioners each reported a $25,000 bonus in 1970 from that corporation.

On the basis of the foregoing, we therefore hold that petitioners' investments in Scifo Enterprises, Ltd., did not become worthless in 1970; accordingly, petitioners are not entitled to deductions for worthlessness of their investments in that corporation for 1970.

*Decisions will be entered under Rule 155.*

