MORRIS SANKARY and WANDA SANKARY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sankary v. Commissioner
Docket No. 2496-80.
United States Tax Court
T.C. Memo 1982-387; 1982 Tax Ct. Memo LEXIS 361; 44 T.C.M. (CCH) 414; T.C.M. (RIA) 82387; July 12, 1982. Morris Sankary, pro se. Karen Nicholson Sommers, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in and an addition to petitioners' Federal income tax as follows: Sec. 6653(a) [1]
Year
Deficiency
Addition to Tax
1970
$421.02
1971
4,785.35
1972
43,806.00
$2,190.30
1973
31,028.00
1974
25,030.80
*362 After concessions, the issues are (1) whether certain payments were loans or contributions to capital; (2) if the payments were loans, whether they were made in connection with a trade or business; (3) in what year certain stock or debts became worthless; and (4) whether the failure to report a gain in 1972 was due to negligence. [2]
FINDINGS OF FACT Some of the facts are stipulated and found accordingly. Petitioners, Morris Sankary and Wanda Sankary, resided in San Diego, Calif., when they filed their petition herein. Morris Sankary (hereinafter petitioner) is a lawyer in private practice. His law practice consists largely of work connected with low-cost housing development. In late 1968, petitioner was approached by Thomas Sutherland and Michael Ryan concerning a business then known as *363 Granada Plastics Co. At that time, Sutherland and Ryan were Granada employees. Sutherland and Ryan had two requests of petitioner: (1) to represent them concerning an emerging business deal with Diner's Club, Inc. [3] and (2) to solicit help in exercising an option they had to acquire Granada from its owner. In 1968, Granada was a sole proprietorship owned by Harold J. Kurt. Its primary business was the manufacture of expanded polystyrene panels, and it had developed a prefabricated housing system which used those panels. Sometime in 1968, Kurt suffered a stroke and granted four of his employees, including Sutherland and Ryan, an option to acquire Granada. If unexercised, the option was to expire March 10, 1969. In October 1968, Sutherland, Ryan, and Douglas E. Leston formed Continental Components Corporation, a California corporation, intending the corporation to exercise the option. [4] *364 When formed, Continental Components Corporation (hereinafter CCC) was authorized to issue 75,000 one dollar par shares of stock. However, no shares were initially issued and, for awhile, CCC was a mere shell. Sutherland and Ryan did not have the money necessary for CCC to exercise the option. Thus, as reflected in CCC's November 1, 1968, minutes, they agreed to "immediately commence action in an attempt to secure an investor or investors with the sum of Seventy-five thousand dollars ($75,000) to be loaned to the corporation * * *." Further, those minutes state: "It is contemplated that the money so secured will be exchanged for capitol [sic] stock * * * if the same is approved by the Commissioner at a later date." [5]
In March 1969, petitioner transferred $1,000 to CCC and received CCC shares. No other CCC shares *365 were ever issued. The parties agree petitioner was CCC's sole shareholder from March 1969 until CCC ceased operation. Sometime in 1969, petitioner advanced $100,000 to CCC. [6] Apparently, sometime in March 1969, CCC exercised the option and took over Granada's business. [7] In November 1969, petitioner guaranteed a $100,000 loan to CCC from Southern California First National Bank. The proceeds of that loan were put in a time certificate of deposit and pledged as collateral for the loan. Petitioner intended such "paper transaction" to evidence an intent that the original $100,000 advanced by him to CCC was a loan. The record does not reveal whether the time certificate of deposit was in petitioner's name or in CCC's name. *366 Initially, Sutherland served as CCC's president, and petitioner was CCC's secretary-treasurer and counsel. Sutherland died sometime after petitioner became sole shareholder of CCC. After Sutherland died, petitioner served as CCC's president. [8] While CCC's polystyrene panels drew a great deal of attention and CCC showed great promise of financial success, CCC never thrived in actuality. A series of attractive deals either fell through or failed to live up to expectations. [9] However, at least through mid-1970, it appeared CCC was in a position eventually to do very well. *367 In 1970, petitioner guaranteed a $300,000 loan from Wells Fargo Bank to CCC. The exact date of the loan is not revealed on the record. The $300,000 was used in part to pay off the $100,000 loan from Southern California First National Bank. The $100,000 time certificate of deposit was pledged as collateral to Wells Fargo along with securities, unrelated to CCC, owned by petitioner.[10]
Despite great promise, CCC failed. In 1971, Wells Fargo Bank applied the $100,000 time certificate of deposit to the loan petitioner guaranteed. In 1972, petitioner paid Wells Fargo Bank $46,400 on the CCC loan and paid third parties $8,654.66 on CCC's behalf. In 1973, petitioner paid Wells Fargo Bank $29,508 on the CCC loan and paid third parties $10,250 on CCC's behalf. Also in 1973, Wells Fargo Bank sold petitioner's pledged securities and applied the proceeds to the CCC loan. In 1974, petitioner paid third parties, $4,400.24 on CCC's behalf. Petitioner's actions as a representative and officer of CCC and his actions as an individual often were entwined. For example, a December 1970 agreement concerning exclusive *368 rights to a glue for use with polystyrene panels was executed by petitioner individually but noted petitioner was the sole CCC shareholder. The same was true with respect to an August 1971 contract concerning the development of a solid standing styrene panel. In March 1969, petitioner bought land adjacent to CCC's plant to lease to CCC. At other times, he bought equipment to lease to CCC. [11] Petitioner's work with respect to CCC led to other contracts. For instance, he went to both Germany and Israel to discuss low-cost housing development using panels, and he formed a number of California corporations with businesses related to CCC's business. Although petitioner served as both counsel and an officer of CCC, he was never paid. An amount owed him was accrued on CCC's books and records. The other CCC employees were paid. Early agreements to sell the CCC stock fell through. In October 1969, petitioner negotiated with Westport Enterprises, Inc., for the exchange of his CCC stock. A "tentative understanding" provided Westport would pay petitioner $100,000 worth of Westport *369 common stock and $89,000 on the understanding petitioner had "loaned or advanced" that amount to CCC. Additionally, Westport would divide $50,000 worth of its common stock between Sutherland (70 percent), Ryan (15 percent), and Marshall Welty (15 percent), and would guarantee those individuals set salaries. A letter dated December 18, 1969, from petitioner to a representative of Hubble Development Company discussed a "possible future merger" of CCC and Hubble. That letter noted liabilities of CCC as being a $100,000 bank note, $25,000 in current obligations, $40,000 in equipment payments, and $25,000 in needed operating capital. Petitioner proposed that Hubble agree to assume those liabilities, to give Sutherland guarantees via an employment contract and stock option, to give petitioner a retainer agreement, and to give petitioner a 49 percent interest in Hubble. All this would be in exchange for petitioner relinquishing a 51 percent interest in CCC. On February 7, 1972, petitioner signed a Letter of Intent with Odis Walton and Associates (Walton), evidencing plans for petitioner to sell all the CCC stock. That Letter of Intent noted petitioner "has spent over three years *370 developing [CCC] * * * and has spent approximately $500,000 in developing [CCC] to its present status." The $500,000 was noted as being made up of cash investment, personal loans, guaranteed bank loans, services, and "general creditor indebtedness." While no breakdown was given, the guaranteed $300,000 loan from Wells Fargo Bank was noted specifically. The basic agreement evidenced by the Letter of Intent was that, in exchange for all the CCC stock, Walton would relieve petitioner's personal guarantee on the Wells Fargo Bank loan, secure return of petitioner's pledged securities and the time certificate of deposit, pay third parties $42,000, and provide necessary working capital while holding petitioner harmless. Pursuant to the agreement, CCC's operations and books and records were turned over to Walton. Walton later defaulted by failing to pay state taxes, and local authorities closed CCC. Petitioner never recovered the surrendered books and records.
In January 1973, petitioner negotiated an agreement with North American Funding, Inc. Basically, that agreement gave North American a nonexclusive license to manufacture the entire line of CCC's products for a certain amount *371 per panel.However, with an eye toward CCC's "loss carry-forward" the agreement provided for an exchange of petitioner's CCC stock for 30,000 shares of North American's ten cent par value common stock. The North American agreement was never carried out. The initial capitalization of CCC was limited to the $1,000 paid in by petitioner. The debt-to-equity ratio reflected on CCC's Federal income tax returns was $241,758 to $1,000 and $363,833 to $1,000 on October 31, 1970, and October 31, 1971, respectively. Those returns also report loans from shareholders of $1,250 and $30,617.49, as of October 31, 1971, and October 31, 1972, respectively. The return for CCC's fiscal year ending October 31, 1972, reports $115,839.01 as "contributed surplus." On their Federal income tax returns for 1972, 1973, and 1974, petitioners claimed as ordinary losses the amounts petitioner forfeited on CCC's behalf. Additionally, petitioners claimed those losses gave rise to net operating loss deductions based on carryovers and carrybacks in all the years in issue. In his statutory notice of deficiency, respondent determined petitioner sustained capital losses in 1973 and 1974 rather than ordinary losses *372 in those or any other years. OPINION The principal issue before us is whether certain payments made by petitioner to or on the behalf of CCC were loans or contributions to capital. If the payments were contributions to capital, they can only give rise to capital loss when the CCC stock became worthless. See sec. 165(g). If the payments were loans, when wortheless they can give rise to either ordinary loss if business related or short-term capital loss if not business related. See sec. 166. In 1969, petitioner advanced $1,000 to CCC and received 100 percent of CCC's stock. Also in 1969, petitioner advanced $100,000 to CCC, apparently so CCC could acquire Granada Plastics. See note 7, supra. In 1970, petitioner guaranteed a $300,000 loan to CCC. In 1971, 1972, and 1973, petitioner paid, in total, $306,469.19 pursuant to that guarantee. [12] In 1972, 1973, and 1974, petitioner paid third parties, in total, $23,304.90 on CCC's behalf. The amount of the ultimate loss petitioner incurred with respect to CCC is not in issue. [13]
*373 Respondent maintains all the payments in issue were contributions to CCC's capital which only give rise to a capital loss deduction in the year the CCC stock became worthless. See secs. 165(g) and 166(e). Respondent contends 1973 was the year of worthlessness. Petitioner maintains all the payments in issue were in effect loans to CCC which give rise to section 166 bad debt deductions. Alternatively, petitioner contends that, if contributions to capital were made, 1972 was the year the CCC stock became worthless. [14] We agree with respondent that all the payments at issue herein were contributions to CCC's capital; however, we agree with petitioner that 1972 was the year of worthlessness. Whether a payment by a shareholder to or on the behalf of the corporation is a loan or a contribution to capital is a question of fact. A.R. Lantz Co. v. United States,424 F.2d 1330 (9th Cir. 1970); *374 Yale Avenue Corp. v. Commissioner,58 T.C. 1062 (1972). [15] In this case, it is a question upon which petitioner bears the burden of proof. See Rule 142(a). We are unable to find that burden has been met. *375 As the United States Supreme Court noted in John Kelley Co. v. Commissioner,326 U.S. 521, 530 (1946), there is no single factor from which a determination of debt versus equity may be made.Instead, all the circumstances must be considered before an answer may be reached. Nevertheless, petitioner contends he intended loans and, therefore, loans they were. While the intent of the parties is of paramount importance in separating loans from contributions to capital, neither the taxpayer's statement of intent nor any documentary characterization is binding. See A.R. Lantz Co. v. United States,supra;Thompson v. Commissioner,73 T.C. 878 (1980). Petitioner offers only two pieces of documentary evidence to buttress his testimony that the payments were loans. One is a letter to the attorney for Granada's former owner wherein petitioner expresses an intent to loan funds to CCC. The other is the December 1969 negotiations with Hubble Development Company. Neither is convincing. The letter to the attorney concerns only a $15,000 advance proposed in 1969. It bears little perceivable relation to the amounts at issue herein. *376 While the early 1969 occurrences are generally relevant, our primary concern is directed at events as they existed in 1970 when the Wells Fargo Bank loan was made. [16] Such is true because, when a payment is made in satisfaction of a guarantee, the debt versus equity analysis is made with a view to when the guarantee is made rather than to when payment is made. See Putnam v. Commissioner,352 U.S. 82 (1956); Arrigoni v. Commissioner,73 T.C. 792 (1980). [17] Even if we were convinced petitioner made any 1969 loans to CCC, see note 13, supra, such would hardly be dispositive with respect to the 1970 guarantee. In regard *377 to the December 1969 negotiations with Hubble Development Company, we fail to see how those negotiations support petitioner's position. In fact, the only documentary evidence, authored by petitioner, of those negotiations notes CCC's liabilities as including a $100,000 bank loan, but does not refer to any loans by petitioner. Stated summarily, petitioner has given us little but his statement to support his loan characterization. [18]
We have before us no notes or other indicia of indebtedness. Petitioner *378 maintains he received demand notes from CCC carrying 7 percent interest. [19] Yet, such notes were not introduced. While CCC's books and records were lost to petitioner when they were turned over to Odis Walton and Associates in 1972, that does not explain the absence of any notes given to petitioner from CCC. While we draw no inferences from petitioner's failure to introduce CCC's books and records, given their unavailability, we do pause at petitioner's failure to introduce notes presumably in his possession or to offer any supporting testimony other than his own. Furthermore, CCC's Federal income tax return reports $115,839.01 as "contributed surplus" and $30,617.49 as loans from shareholders. Petitioner offered no explanation of those figures, and, as previously noted, it is he who carries the burden. In addition to petitioner's lack of proof, several factors indicate the payments were contributions to capital. The initial stated capital of CCC was only $1,000 while the purported loans at issue herein *379 total over $300,000. An inadequate or "thin" capitalization indicates advances may well be further capitalization rather than loans. Jewell Ridge Coal Corporation v. Commissioner,318 F.2d 695, 699 (4th Cir. 1963), affg. a Memorandum Opinion of this Court. Additionally, CCC's business was speculative in that it was operating in a relatively new field. While a number of attractive deals arose, none ever lived up to expectations. While through mid-1970 it appeared CCC eventually might do very well, we are unconvinced independent lenders, absent petitioner's guarantee, would have advanced CCC funds. [20] Such can indicate a capital contribution. See generally Schnitzer v. Commissioner,13 T.C. 43 (1949), affd. 183 F.2d 70 (9th Cir. 1950). *380 In summary, petitioner has offered little, if any, evidence to support his assertion that loans were intended. When coupled with other factors indicating capital contributions were more likely than loans, we only can conclude petitioner has failed to meet his burden of proof. Thus, we find all the payments at issue herein were contributions to capital. [21]
Having found the payments were contributions to capital, they are deductible as part of petitioner's basis in CCC only in the year the CCC stock became worthless. See secs. 166(e) and 165(g). [22] The parties disagree as to whether 1972 or 1973 is the year of worthlessness. [23]
*381 The year in which stock becomes worthless is a question of fact. See Scifo v. Commissioner,68 T.C. 714 (1977). As a general rule, worthlessness may be established by showing "some 'identifiable event' in the corporation's life which puts an end to * * * hope and expectation." Morton v. Commissioner,38 B.T.A. 1270, 1279 (1938), affd. 112 F.2d 320 (7th Cir. 1940). Petitioner, pointing to the faltered sale to Odis Walton and Associates followed by the closing of CCC's business, maintains the CCC stock became worthless in 1972. Respondent, pointing to the negotiations with North American Funding, Inc. in January 1973, contends 1973 was the year of worthlessness. We agree with petitioner. By 1972, CCC had suffered a series of lost business opportunities. When the Letter of Intent was signed with Odis Walton and Associates in February 1972, CCC had little value. The content of that letter boils down to a recoupment of losses and no more. When the deal fell through, CCC went under. The mere fact that petitioner attempted unsuccessfully *382 to derive something from his CCC investment in 1973 shows him to be more of an "incorrigible optimist" than anything else. See generally United States v. White Dental Co.,274 U.S. 398 (1927). [24] In fact, a fair reading of the North American agreement might be that North American was interested in CCC's losses more than anything else. Thus, we find 1972 was the year in which the CCC stock became worthless.
Negligence Addition to Tax
FINDINGS OF FACT On their Federal income tax return for 1972, petitioners failed to report a capital gain of $20,843.17 from the sale of real property. *383 When the return was prepared, petitioner was in Israel. Petitioner's wife, Wanda Sankary, also an attorney and a petitioner herein by virtue of the filing of joint returns, gave petitioners' records to an accountant for preparation of the 1972 return. Due to an oversight, the capital gain was not included on the return. In his statutory notice of deficiency, respondent asserted failure to report the capital gain was due to negligence and determined a section 6653(a) addition to tax for 1972. OPINION There is no dispute petitioners failed to report a sizeable capital gain on their 1972 Federal income tax return.However, they contend it was mere "oversight" instead of negligence.
Section 6653(a) imposes an addition to tax if any part of an underpayment is due to negligence. Once respondent determines liability for such an addition in his statutory notice of deficiency, the burden rests with petitioners to show such determination was erroneous. Enoch v. Commissioner,57 T.C. 781, 802 (1972). The mere fact that information was turned over to an accountant and an "oversight" *384 was made does not absolve petitioners. See Pritchett v. Commissioner,63 T.C. 149, 174 (1974). We sustain respondent's determination that petitioners are liable for the section 6653(a) addition to tax for 1972. To reflect concessions and the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise provided, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Resolution of the first three issues listed above will resolve any issue as to claimed net operating loss deductions based on carryovers and carrybacks.↩
3. The deal with Diner's Club, Inc., concerned the erection of a floating hotel complex for which Granada or its successor would supply the floatation system. Petitioner's representation included negotiations with the San Diego Port Authority. Apparently, the deal later fell through.↩
4. The option agreement permitted exercise of the option by a partnership or corporation. While not one of the employees named in the option agreement, Douglas E. Leston participated. However, he resigned as a director of Continental Components Corporation in February 1969.↩
5. Apparently, "Commissioner" refers to the California Corporations Commissioner.↩
6. Enclosed in a letter dated March 14, 1969, from petitioner to Thomas A. Comstock, an attorney for Granada's then owner, was a $15,000 check drawn on petitioner's personal account with instructions that it not be cashed because "[i]t is my [petitioner's] intention to * * * loan the funds evidenced by this check to the corporation and give you a certified check prior to close of escrow." ↩
7. We make our finding as to exercise of the option as "apparently," because there is no direct proof of such. However, the whole trial proceeded with such as an obvious assumption.↩
8. The record does not reveal when Sutherland died. We have before us documents dated August 12, 1969, and December 15, 1969, which Sutherland signed as president of CCC and petitioner wrote as secretary-treasurer of CCC, respectively. We also have before us a document dated July 13, 1970, which petitioner wrote as president of CCC. Thus, we assume Sutherland died after December 15, 1969, and before July 13, 1970. ↩
9. For example, 1969 deals to erect a series of prefabricated post offices, and to supply panels for an entire development in Orange County, Calif., both fell through. Contracts with a builder for add-a-rooms and with Westward Coach Corporation for up to 1.5 million dollars worth of panels never produced their expected revenues. Other transactions, such as air cargo container manufacturing and numerous housing development projects, were in the works but produced little.↩
10. Petitioner's basis in those pledged securities was $130,561.19.↩
11. No rent to petitioner was ever paid by CCC. Any such payments merely were accrued on CCC's books.↩
12. Included within the $306,469.19 is the $100,000 certificate of deposit and petitioner's $130,561.19 basis in securities sold to satisfy the loan obligation. See p. 5, supra.↩
13. We do not treat the 1969 advance of $100,000 made by petitioner to CCC as being either an unpaid loan to CCC or part of petitioner's capital investment in CCC. As we view the facts, if that advance was a loan, it was repaid when the $100,000 time certificate of deposit arose. Petitioner bears the burden of proof, Rule 142(a), and did not address by any evidence the name in which that certificate was issued. When the Wells Fargo Bank loan was obtained, $100,000 of its proceeds were used to pay the Southern California First National Bank loan thus freeing the certificate. Then, the certificate was pledged, along with petitioner's securities, as collateral for the Wells Fargo Bank loan. Such indicates the certificate was petitioner's. Furthermore, the Letter of Intent with Odis Walton and Associates provided for return of both the securities and the certificate to petitioner. Thus, only the amounts paid by petitioner pursuant to his guarantee of the Wells Fargo Bank loan, including application of the certificate and securities to that loan, and amounts paid third parties on CCC's behalf are in issue. See n. 15, infra.↩
14. Due to our holding, infra,↩ that all the payments at issue herein were contributions to capital, we need not address the parties' arguments concerning whether any bad debts were business versus nonbusiness. See sec. 166(d).
15. As previously noted the parties agree petitioner was CCC's sole shareholder from March 1969 until CCC ceased operation. We accept that agreement. At various stages in this case, it seemed petitioner was arguing he was never really CCC's sole shareholder, because he only held the CCC shares as security for amounts advanced by him to CCC. However, we have before us no documentation, other than a proposal type reference in CCC's early minutes, indicating petitioner was anything other than both legal and equitable owner of CCC's shares. In various business dealings, petitioner represented himself as CCC's sole shareholder. Twice in 1969, petitioner negotiated for the disposition of the CCC stock. In one he would have received $100,000 worth of the acquirer's shares and payment of amounts advanced to CCC. In the other, CCC's liabilities would have been assumed, and petitioner would have retained a 49 percent interest in CCC and obtained a 49 percent interest in the acquirer. Both negotiations treat petitioner as owning the CCC stock. Given petitioner's status as sole shareholder, it cannot be questioned the $1,000 originally paid for the CCC shares was a contribution to capital.↩
16. The record does not reveal the source of petitioner's obligations to the third parties to whom he made payments on CCC's behalf. See discussion of those payments at n. 21, infra.↩
17. Petitioner also relies on four checks, totaling $1,400, issued by him to Sutherland and Ryan in March 1969. Two of those checks carry handwritten, margin notations of "loan." We do not find those checks supportive of petitioner's position.↩
18. Petitioner's basic premises seems to be that he "loaned" CCC funds to keep CCC going in anticipation of CCC becoming a valuable client in this law practice. Petitioner offered a plethora of papers to demonstrate the scope and nature of this law practice. However, most of those papers reveal petitioner was often an investor looking to profits in addition to or instead of a lawyer earning fees. In only one document relevant herein is petitioner's position as an attorney noted prominently. In his proposal to Hubble Development Company, he suggested he be given a retainer agreement. However, the same proposal suggested a continuing equity interest which seems to be dominant.↩
19. It is unclear as to which payments, i.e., the original $100,000 advance or the Wells Fargo Bank loan guarantee payments, petitioner maintains those notes related.↩
20. Furthermore, while we have been able to find CCC was in a position eventually to do well at least through mid-1970, we do not know when in 1970 the Wells Fargo Bank loan was made. It could have been made in early 1970 when things were looking up or in late 1970 when things were beginning to slide. Again, petitioner has failed to provide us with relevant information.↩
21. Our discussion, supra, concentrates mainly on the payments made with regard to the Wells Fargo Bank loan guarantee, because all↩ we know about the payments made to third parties is that they were made to third parties on CCC's behalf, their amount, and the year in which they were paid. Their origin is left as a mystery to us. Thus, with respect to the third party payments, petitioner's failure of proof is even more glaring.
22. Section 165(g) mandates capital loss in this situation. Petitioner does not contend it is other than long-term capital loss in this case. ↩
23. Of course, the $4,400.24 paid to third parties in 1974 is not deductible until 1974. Likewise, if 1972 is the year of worthlessness, payments made in 1973 are not deductible until 1973, since petitioner was a cash basis taxpayer.↩
24. On brief, petitioner argues for the first time that he is entitled to ordinary loss because the CCC stock was not a capital asset in his hands under the doctrine of Corn Products Co. v. Commissioner,350 U.S. 46 (1955). While petitioner offered extensive evidence of his dealings in low-cost housing development and his law practice, that evidence indicates petitioner operated both as an attorney and an investor in many deals. Which was dominant in this case, he simply has not shown. See United States v. Generes,405 U.S. 93↩ (1972).