DOLORES FELDMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Feldman v. Commissioner
Docket No. 41985-86
United States Tax Court
T.C. Memo 1991-153; 1991 Tax Ct. Memo LEXIS 172; 61 T.C.M. (CCH) 2341; T.C.M. (RIA) 91153; April 4, 1991, Filed *172 Decision will be entered under Rule 155. Petitioner was divorced from her husband (H) in 1977. H appealed the trial court judgment, and on remand in 1978, a second divorce decree was issued. The second decree retroactively reduced the amount of alimony due under the first decree by $ 175 per week. Petitioner was obligated to repay $ 19,425 to H, with a $ 10,535 offset, resulting in a net obligation to H of $ 8,890. Petitioner claimed she made the payments totalling $ 8,890 to H. Petitioner received from H amounts "for her support and maintenance", and included those amounts in income on her tax returns for 1977 through 1982; however, for 1981 and 1982 she deducted the amounts she had included. Held: (1) Petitioner is entitled to deduct the amounts that she repaid but had previously included in income. (2) Petitioner's 1981 and 1982 receipts from H are "periodic payments" and not a property settlement; petitioner must include them in income; the claimed 1981 and 1982 deductions are disallowed. Sec. 71, I.R.C. 1954. Petitioner and H formed a corporation (M) in 1968, contributing cash and depreciated property in exchange for stock. M ceased operations in 1977. Petitioner and *173 H also owned other corporations. She contends that her stock in (and loans to) those corporations became worthless. Held: (3) Petitioner's stock in M became worthless in 1977. Amount of loss determined. Petitioner is entitled to capital loss carryover deductions. Secs. 1212(b), 165(f), 165(g)(1), and 1211(b), I.R.C. 1954. (4) Petitioner is not entitled to bad debt deductions or other worthless stock deductions for any of the years in issue; burden of proof. Petitioner and her former husband were involved in litigation in connection with their divorce and with the corporations they owned. Held: (5) Petitioner is entitled to deduct 10 percent of the legal fees paid incident to her divorce. Cohan v. Commissioner, 39 F.2d 540 (CA2 1930). (6) Petitioner is not entitled to deduct the claimed additional amounts relating to the corporate litigation; burden of proof. (7) Petitioner is not entitled to other claimed deductions; burden of proof. Petitioner's 1981 and 1982 tax returns were received by respondent on August 19, 1983. Held: (8) Petitioner timely filed a request for an automatic 4-month extension to file her 1982 tax return. Sec. 6081, I.R.C. 1954. (9) Petitioner *174 failed to file her 1981 and 1982 tax returns on time; her failure to file timely was not due to reasonable cause; burden of proof. Petitioner is liable for additions to tax under sec. 6651(a)(1), I.R.C. 1954, for 1981 (25 percent) and 1982 (5 percent). Frank W. Louis[1] and Dolores E. Feldman, pro se, for the petitioner. John J. Ferrante, for the respondent. CHABOT, Judge. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in Federal individual income tax and additions to tax under section 6651(a)(1)[2] *175 (failure to file timely return) against petitioner as follows: Additions to Tax
Year
Deficiency
Sec. 6651(a)(1)
1978 [3]
$ 1,657.38
$  414.34
1981
1,051.00
262.75
1982
2,186.00
109.30
After concessions, the issues for decision are as follows: (1) Whether petitioner is entitled to deduct her payments to her former husband for repayment of overpaid alimony; (2) Whether amounts received by petitioner from her former husband in 1981 and 1982 constitute taxable alimony income; (3) Whether, to what extent, and for what years petitioner is entitled to a deduction for worthless stock under section 165, or to nonbusiness bad debt deductions under section 166, as a result of petitioner's dealings with various corporations; (4) Whether petitioner is entitled to deduct amounts allegedly paid in connection with various litigation; and (5) *176 Whether petitioner is liable for additions to tax under section 6651(a)(1).
FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioner resided in Greenwich, Connecticut. Divorce -- Alimony; Legal Fees
On March 17, 1949, petitioner married Martin Feldman (hereinafter sometimes referred to as "Martin"), a dentist with his practice in Brooklyn, New York. Four children were born of this marriage, namely Patricia (born about 1952 or 1953), Sandy (born December 22, 1955), Gwendy (born June 11, 1958), and Robert (born November 3, 1960). By a decree dated January 27, 1977 (hereinafter sometimes referred to as "the First Decree"), the Supreme Court of New York, County of Nassau (hereinafter sometimes referred to as "the State Court"), granted a judgment of divorce to petitioner. Martin appealed the State Court's judgment, and the Appellate Division (New York State's intermediate appellate court) modified the judgment by deleting those provisions which fixed the amounts of alimony and child support, custody and visitation rights, and *177 counsel fees, and by remanding to the State Court for a hearing and a new determination of those issues. On remand, the State Court issued a decree (hereinafter sometimes referred to as "the Second Decree") dated November 29, 1978, resettling the January 27, 1977, judgment. Both the First Decree and the Second Decree grant petitioner's complaint for divorce and dismiss on the merits Martin's counterclaim for divorce. The First Decree orders joint custody for Robert, but that he should live with petitioner; the Second Decree gives custody to Martin. Both decrees provide for sale of the marital residence, division of the proceeds, and division of the household furniture. The First Decree orders Martin to pay to petitioner -- the sum of Five Hundred ($ 500.00) Dollars per week as and for her support and maintenance, on Friday of each week retroactive to January 16, 1976, and after allowing [Martin] credit against said obligation for all amounts of temporary alimony paid by him to [petitioner] since January 16, 1976, as established by the aforementioned affidavit of [petitioner], dated December 13, 1976, there remains a net balance due to [petitioner] of Fifteen Thousand ($ *178 15,000.00) Dollars for the period from and including the week beginning January 16, 1976 to and including the week beginning December 10, 1976, and said sum of $ 15,000 shall be paid to [petitioner] by her retaining and deducting said amount from the aggregate amounts which, under subsequent portions of this judgment, [Martin] is entitled to recover from [petitioner] under counterclaims fourth, fifth, seventh and eighth of [Martin's] answer herein.
The First Decree further orders -- that commencing with the first Friday after the closing of title to the marital home upon a sale to [Martin] or to a third party or parties, as hereinabove provided, or in the event that [petitioner] vacates the marital home prior to the closing of title thereto, the support and maintenance of [petitioner] to be paid by [Martin] shall be increased to Six Hundred Twenty-Five ($ 625.00) Dollars per week.
The Second Decree reduces the amounts of "support and maintenance" payments due from Martin to petitioner, stating -- that [Martin] shall pay [to petitioner] * * * Three Hundred Twenty-Five ($ 325.00) Dollars per week as and for her support and maintenance, on Friday of each week commencing *179 January 16, 1976, and that commencing on the first Friday after [petitioner] leaves the marital residence, [Martin] shall pay [to petitioner] the sum of Four Hundred Fifty ($ 450.00) Dollars per week as and for her support and maintenance, by check or money order, at the present residence or any other address designated by her in writing * * * The Second Decree orders petitioner to -- refund to [Martin] the sum of One Hundred Seventy-Five and 00/100 ($ 175.00) Dollars per week representing the difference between weekly alimony originally awarded and that fixed herein, for every week that he shall have made payments fixed in the judgment of January 27, 1977, [the First Decree] said payments having been made for one hundred and eleven (111) weeks with a total over-payment of $ 19,425; and it is further ORDERED, that [Martin] pay to [petitioner] the sum of $ 10,535.00, representing education expenses of GWENDY, such amount to be credited towards [petitioner]'s obligation to [Martin] in the preceding decretal paragraph; and it is further ORDERED, that the payment by [petitioner] to [Martin] of $ 19,425.00 pursuant to this order is accordingly reduced by the sum of $ 10,535.00 *180 which is payable by [Martin] to [petitioner] pursuant to this order, making a net total payment due by [petitioner] to [Martin] of $ 8,890.00, payable at the rate of $ 200.00 per month, commencing thirty (30) days after entry of this order until the entire balance is fully paid * * * .
Both decrees order Martin to make all mortgage payments, and to pay all bills for fuel and utilities (except telephone), and to pay for major repairs or replacements and gardening maintenance expenses, for the marital home until it is sold and title conveyed. Both decrees order Martin to pay all the education and related expenses (e.g., lodging and transportation) expenses of Gwendy and Robert. The First Decree applies this obligation until the children complete their college education; the Second Decree only until the children reach age 21. Both decrees order Martin to pay $ 50 per week to petitioner "as and for the additional living expenses of GWENDY" when Gwendy resides with petitioner. The First Decree provides another $ 50 per week as to Robert; the Second Decree does not, consistent with its award of Robert's custody to Martin. Both decrees deal with a series of eight of Martin's counterclaims *181 regarding savings accounts, mostly awarding to Martin one-half interests in joint accounts and in accounts in petitioner's name in trust for one or more of petitioner's and Martin's children. Petitioner is, in general, awarded the accounts that are in her name only and specified personality (such as 144 oz. of dental gold). The First Decree orders Martin to pay to petitioner -- the sum of Twenty Thousand ($ 20,000.00) Dollars, as and for counsel fees, and the sum of One Thousand Two Hundred Fifty ($ 1,250.00) Dollars, as and for disbursements necessarily incurred herein, and said amounts shall be paid to [petitioner] by delivery thereof to her attorneys, MORAN & BRODRICK, ESQS., * * * within 30 days after personal service upon [Martin] of a copy of this judgment, with notice of entry, of the sum of Eleven Thousand Two Hundred Fifty ($ 11,250.00) Dollars from the monies due to [Martin] from [petitioner] on the seventh and eighth counterclaims of his answer, as hereinabove provided; by the payment of an additional Five Thousand ($ 5,000.00) Dollars within sixty (60) days after personal service upon [Martin] of a copy of this judgment, with notice of entry; and by the payment *182 of an additional Five Thousand ($ 5,000.00) Dollars within ninety (90) days after said date * * *.
The Second Decree reduces the attorney's fees Martin owes to petitioner to $ 15,000 plus $ 1,250 of costs; however, it provides that Martin also owes petitioner $ 3,000 attorney's fees for the appeal of the first trial and $ 4,750 attorney's fees for the second trial, making a total of $ 22,750 plus $ 1,250 costs. Petitioner moved out of the marital home in or about January 1977. On her tax returns, petitioner reports alimony income and offsetting deductions in the amounts shown in table 1. Table 1
Year
Alimony Income
Offsetting Deduction
1977
$ 28,500
-0-  1978
17,500
[4] -0-  1979
21,600
-0-  1980
17,200
-0-  1981
24,400
$  24,400
1982
22,910
22,910
*183 On her 1981 tax return, petitioner claims a $ 24,400 deduction as "Other adjustments" and she notes the following next to the alimony income item: "Awaiting court decree may be capital distribution presently in suspense with IRS." On her 1982 tax return, petitioner claims a $ 22,910 deduction as "Alimony paid" and has a notation similar to that on her 1981 tax return. Petitioner repaid the $ 8,890 mandated by the Second Decree, by Martin's self-help mechanism. That is, Martin reduced by $ 50 each of the alimony payments he made to petitioner, until the full amount was paid. In this manner, petitioner repaid to Martin $ 200 in 1978, $ 2,400 in 1979, $ 1,900 in 1980, $ 2,700 in 1981, and $ 1,690 in 1982. During most of the divorce proceedings, petitioner was represented by Eugene J. Moran (hereinafter sometimes referred to as "Moran"). In 1977 and pursuant to the First Decree, Martin paid to Moran $ 19,250 in legal fees relating to the divorce on behalf of petitioner, [5] of which $ 1,925 was attributable to the production of taxable alimony income. *184 Worthless Stock
Medi-Serv Corporation of America (hereinafter sometimes referred to as "Medi-Serv") was incorporated June 25, 1968. Medi-Serv used a fiscal year ending June 30. Medi-Serv's principal business activity was providing management services for medical and dental professionals. Medi-Serv leased properties from owners, and sublet the properties to professionals. Medi-Serv initially issued 400,000 shares (10 cents par value), 200,000 shares each to Martin and petitioner, on July 1, 1968, in exchange for which Martin and petitioner together transferred to Medi-Serv a total of $ 90,355 ($ 50,000 in cash and $ 40,355 in fair market value of dental equipment). Some of the dental equipment was already depreciated. The dental equipment had originally been bought by petitioner and Martin for use in Martin's practice of dentistry. After the equipment was contributed to Medi-Serv, Medi-Serv leased it to Martin. On March 25, 1969, Medi-Serv filed a preliminary prospectus for a public stock offering with the Securities and Exchange Commission. The stock offering was not made. On July 1, 1976 (the start of Medi-Serv's last fiscal year), the book value of Medi-Serv's assets *185 exceeded the liabilities. In January and February 1977, Medi-Serv sold some equipment that it had been using in its trade or business. Medi-Serv ceased doing business in 1977. Medi-Serv filed a final Federal corporate income tax return for its fiscal year ending June 30, 1977. Medi-Serv did not have any ongoing concern value by the end of 1977. The Medi-Serv stock became worthless in 1977, not earlier. When Medi-Serv went out of business, its capital account was $ 40,300 capital stock (indicating that there were 403,000 shares of $ 0.10 par stock outstanding) plus $ 23,159 paid-in or capital surplus, and its retained earnings were a loss of $ 75,276. Petitioner's basis in her 200,000 shares of Medi-Serv stock [6], when Medi-Serv went out of business, was $ 31,493.30. *186 Other corporations which Martin and petitioner owned, in whole or in part, included: 453 Stone Avenue Medical X-Ray Laboratory, Inc. (hereinafter sometimes referred to as "453 X-Ray") and PSGR Management Corp. (petitioner was 50 percent shareholder, and each of petitioner's and Martin's four children owned 12-1/2 percent of each corporation); and 453 Holding Corp., Patsan Holding Corp., and Dolmar Holding Corp. (each owned by both Martin and petitioner; each used a fiscal year ending September 30). 453 X-Ray provided x-ray services to medical professionals through a technician employed by 453 X-Ray. PSGR Management Corp. leased space to doctors and provided equipment, personnel, billing, record keeping, and other services. 453 Holding Corp. owned a two-story building at 453 Stone Avenue, Brooklyn, New York. Dolmar Holding Corp. owned three properties: 441 Stone Avenue, 443 Stone Avenue, and 3590 Nostrand Avenue, all in Brooklyn, New York. Corporate Litigation Legal Fees
Petitioner and Martin were involved in litigation relating to several of their corporations during 1975 (these lawsuits are hereinafter sometimes referred to as "the corporate litigation"). On January 13, *187 1975, PSGR Management Corp. and 453 X-Ray sued Martin. In their verified complaint, the corporations allege that Martin (1) was denying to them access to corporate books and papers, financial records, and tax returns, and (2) converted corporate funds to his own use. In his affidavit in opposition, Martin maintains that he had to take over the operations of 453 X-Ray because petitioner abandoned her job and did not pay the employees' salaries, and that Martin had taken in receipts, but had paid out salaries and expenses which exceeded those receipts. Petitioner's affidavits and Martin's affidavit also contain numerous emotional accusations relating to each other's conduct both personally and professionally. Later in 1975, petitioner instituted a stockholder's derivative suit against Martin and 453 Holding Corp., Dolmar Holding Corp., Patsan Holding Corp., and Medi-Serv. In her complaint, petitioner alleges that Martin (1) excluded petitioner from control of the operations of the corporations and (2) converted corporate assets to his own use, converted insurance proceeds due to Patsan Holding Corp. to his own use, and used Medi-Serv funds to buy a $ 40,000 33-foot pleasure boat. *188 Martin then instituted a stock holder's derivative suit against petitioner and the same four corporations. In his complaint, Martin alleges that petitioner (1) converted $ 23,000 of Medi-Serv funds to her own use in 1971, (2) engaged in disruptive actions, including telling the banks where 453 Holding Corp. and Patsan Holding Corp. had their bank accounts not to honor checks signed by Martin, (3) leased space owned by 453 Holding Corp. at far less than fair rental value (4) used Medi-Serv funds to buy a $ 40,000 33-foot pleasure boat and (5) for several years had drawn a salary from 453 Holding Corp. without performing any services. On her tax returns, petitioner claims deductions for legal and accounting fees and for unreimbursed expenses, both categories described as being made to secure business interests, as shown in table 2. Table 2
Year
Legal and Accounting Fees
Unreimbursed Expenses
1977
$ 6,500.00
$ 1,050 1978
350.00
1,100
1979
1,446.00
5,194
1980
4,462.00
2,364
1981
7,334.37
1,030
1982
1,954.07
5,115
Late Filing
Petitioner's 1981 and 1982 tax returns were received by, and filed with, respondent on August 19, 1983. Petitioner's 1981 *189 and 1982 tax returns show a New York State address and respondent's "Received" stamp also shows a New York State address. August 15, 1983, was a Monday, and not a Statewide legal holiday in New York (see N.Y. General Construction Law, sec. 24 (McKinney 1991)). The notice of deficiency lists the deficiencies and the late filing additions to tax for 1978, 1981, and 1982. For 1978 and 1981 the amount of each addition is 25 percent of the deficiency determined for the respective year. However, the amount of the addition to tax calculated for 1982 is only 5 percent of the deficiency determined for 1982. Petitioner filed a timely request for an "automatic" 4-month extension of time for filing her 1982 tax return. OPINION [7]
*190 I. Alimony
A. Repayments of Prior Alimony
The Second Decree retroactively reduced the amount of alimony due under the First Decree by $ 175 per week, creating an obligation of petitioner to repay $ 19,425 to Martin. Petitioner repaid $ 10,535 (representing Gwendy's education expenses) by virtue of the offset in the Second Decree, leaving $ 8,890 to be repaid at the rate of $ 200 per month. Petitioner included the $ 10,535 in income for 1977 and 1978; because she was required by the Second Decree to repay the amount in 1978; she is entitled to a $ 10,535 deduction for 1978, evidently under the "claim of right" doctrine. The parties stipulated to this deduction. Petitioner contends that she repaid the remaining $ 8,890 over several years and should be allowed deductions for those repayments, on the same theory as that applicable to the $ 10,535 for 1978. Respondent disagrees. We agree with petitioner. The Second Decree requires petitioner to pay $ 200 per month to Martin and requires Martin to pay $ 450 per week to petitioner. The Second Decree does not state any provision for offsetting these obligations. Petitioner testified to the manner in which Martin used *191 self-help to secure his refund (i.e., reducing by $ 50 each check he paid to petitioner, until the $ 8,890 was repaid). We believe petitioner's testimony on this matter and have found accordingly. Petitioner is entitled to deduct $ 200 for 1978, $ 2,400 for 1979, $ 1,900 for 1980, $ 2,700 for 1981, and $ 1,690 for 1982, the amounts for each year being determined by reference to the number of alimony payments in the alimony income petitioner reported for each year. See 1 B. Bitker and L. Lokken, Federal Taxation of Income, Estates and Gifts, par. 6.3.3, p. 6-18 (2d ed. 1989); sec. 1.1341-1(h) (Ex.), Income Tax Regs.; sec. 215. We hold for petitioner on this issue. B. Characterization of receipts: alimony or property settlement
Petitioner received from Martin $ 24,400 and $ 22,910 in 1981 and 1982, respectively, and petitioner reported these amounts as alimony income. However, petitioner also deducted these amounts from income for these years, explaining that the amounts might not be alimony when the State Court resolved some unsettled matters. Petitioner contends that Martin's payments to petitioner were part of a property settlement, and did not produce alimony income *192 to petitioner. Respondent argues that under the terms of the Second Decree, the payments from Martin to petitioner produced alimony income to petitioner, and that as a result of those payments, petitioner had taxable alimony income of $ 24,400 and $ 22,910 in 1981 and 1982, respectively. We agree with respondent. Section 71(a)(1)[8] provides that a taxpayer who receives so-called "alimony" is to include it in gross income if each of a series of requirements has been satisfied. One requirement is that the payments have been made in discharge of a legal obligation imposed "because of the marital or family relationship". The quoted phrase has been interpreted to require that, in order to be includible, the payments must be in the nature of support rather than a property settlement. Wright v. Commissioner, 543 F.2d 593, 597 (CA7 1976), affg. 62 T.C. 377, 388-389 (1974); Beard v. Commissioner, 77 T.C. 1275, 1283 (1981); Warnack v. Commissioner, 71 T.C. 541 (1979); Bishop v. Commissioner, 55 T.C. 720 (1971). *193 In resolving the character of an award in a divorce or separation decree, great weight is given to the language and structure of the decree. Griffith v. Commissioner, 749 F.2d 11, 13 (CA6 1984), affg. a Memorandum Opinion of this Court. [9] However, the determination of whether payments are in the nature of support or are part of a property settlement is not controlled by the labels assigned to the payments by the court in the divorce decree or by the parties in their agreement. Jacklin v. Commissioner, 79 T.C. 340, 351-352 (1982); Beard v. Commissioner, 77 T.C. at 1283-1284; Warnack v. Commissioner, 71 T.C. at 551. Rather, the issue is a factual one of intent. Crouser v. Commissioner, 668 F.2d 239, 242 (CA6 1981), affg. 73 T.C. 1113 (1980). In the case of an ambiguous decree, resolution of the issue requires an examination of all the surrounding facts and circumstances. Jacklin v. Commissioner, supra; Beard v. Commissioner, 77 T.C. at 1284. *194 In the instant case, the Second Decree provides "[Martin] shall pay to [petitioner] * * * Three Hundred Twenty-Five ($ 325.00) Dollars per week as and for her support and maintenance, on Friday of each week commencing January 16, 1976, and that commencing on the first Friday after [petitioner] leaves the marital residence, [Martin] shall pay [to petitioner] the sum of Four Hundred Fifty ($ 450.00) Dollars per week as and for her support and maintenance * * *" (emphasis added). This provision clearly sets forth the purpose of the payments and has the effect of causing petitioner's receipts to be periodic payments of the sort described in section 71(a)(1), and includible in petitioner's income. Other parts of the Second Decree clearly provide for property settlement, but they are not related to the part of the decree that provides for the $ 450 weekly payments. Petitioner has neither pointed us to, nor have we found, any ambiguity of intent either by the State Court, or by herself or Martin. We conclude that the payments aggregating $ 24,000 in 1981 and $ 22,910 in 1982 were payments made in discharge of a legal obligation imposed "because of the marital or family relationship". *195 Petitioner contends that Martin's payments to her were really part of a property settlement, in that much of the money to make these payments came out of bank accounts or other assets that were in her name. She contends that this is especially true with regard to the $ 15,000 back alimony that the First Decree ordered Martin to pay to her, but was then ordered to be offset by portions of balances in certain bank accounts. However, she applies the concept generally to all of the payments that Martin made (witness the statements on her 1981 and 1982 tax returns, set forth in our findings after table 1, supra, and the statement in her trial memorandum that "Because my property was in effect taken away, the 'alimony' was in fact a capital distribution"). Our examination of both the First Decree and the Second Decree does not leave any doubt as to the separateness of the alimony provisions from the property settlement provisions. Petitioner draws our attention to Pierce v. Commissioner, 66 T.C. 840, 846-848 (1976). The factual setting on which we based our conclusion in Pierce is not what we face in the instant case. See, e.g., Capodanno v. Commissioner, 69 T.C. 638, 644-645 (1978), *196 affd. 602 F.2d 64, 69 (CA3 1979). Similarly, petitioner's taxability of the $ 15,000 is not affected by the fact that Martin's obligation for retroactive increases in alimony under the First Decree was to be offset, under that decree, by certain of petitioner's obligations to Martin. Tyrer v. Commissioner, 77 T.C. 577 (1981). We hold for respondent on this issue. II. Worthless Stock
A. Medi-Serv
Petitioner contends that (1) the 200,000 shares of Medi-Serv she owned became worthless during 1977, (2) she is entitled to a deduction for worthless stock under section 165(g)(1) for 1977 to the extent of her basis in the stock, and (3) the 1977 deduction reduces petitioner's tax liability for the years in issue through capital loss carry forwards and income averaging. [10]
Respondent contends that petitioner has not carried her *197 burden of proving that any of her stock became worthless, the amount of any loss from worthless stock, or the year in which the stock became worthless. We agree, in general, with petitioner. Subsections (f) and (g)(1) of section 165 [11] *198 treat a loss from securities that become worthless during a taxable year as a loss from the sale or exchange of a capital asset, subject to the limitations of sections 1211 and 1212. Such a loss is deductible for the year in which the securities become wholly worthless. Scifo v. Commissioner, 68 T.C. 714, 725-726 (1977); Aagaard v. Commissioner, 56 T.C. 191, 209 (1971), and cases cited therein; sec. 1.165-4(a) and sec. 1.165-5(c), Income Tax Regs. This is a factual matter, as to which petitioner has the burden of proof, not only as to whether the securities became worthless at all, but also as to whether they became worthless in a year in issue. Boehm v. Commissioner, 326 U.S. 287, 294, 90 L. Ed. 78, 66 S. Ct. 120 (1945); Scifo v. Commissioner, 68 T.C. at 725; Rule 142(a) [12]. We first consider whether the approximately 200,000 shares of Medi-Serv stock owned by petitioner became worthless in 1977. As we stated in Morton v. Commissioner, 38 B.T.A. 1270, 1278-1279 (1938), affd. 112 F.2d 320 (CA7 1940): From an examination of these cases it is apparent that a loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless and the loss is sustained, that stock may not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, and that such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called "identifiable" in that they are likely to be immediately known by everyone having an interest by way of stockholdings or *199 otherwise in the affairs of the corporation; but, regardless of the adjective used to describe them, they are important for tax purposes because they limit or destroy the potential value of stock. The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. [Emphasis added.] In the instant case, Medi-Serv ceased doing business in 1977, which, under the criteria listed above, *200 qualifies as an "identifiable event". Medi-Serv's balance sheet on its final tax return reflects a negative shareholder equity (Capital stock plus Paid-in or capital surplus plus Retained Earnings) as of June 30, 1977. The record also indicates that Medi-Serv reported losses in 1977 and in at least the three preceding years. Based on the foregoing, we are satisfied that Medi-Serv did not have any ongoing concern value at the end of 1977. Also, we conclude, and have found, that the Medi-Serv stock became worthless in 1977, not earlier. We next consider the amount of the worthless stock deduction to which petitioner is entitled. Section 165(b) [13] limits the amount of the deduction for losses from worthless securities to the taxpayer's adjusted basis in the stock. Petitioner maintains that she has a basis in her Medi-Serv stock of $ 45,177.50 ($ 90,355 paid in by petitioner and Martin, divided by 2). However, Medi-Serv's final tax return shows "Capital stock" plus "Paid-in or capital surplus" of $ 63,459, half of which is only $ 31,729.50. Some of the dental equipment was already depreciated before it was contributed to Medi-Serv; this may explain the discrepancy. Also, it *201 appears that 403,000 Medi-Serv shares were outstanding at the end of its 1977 fiscal year. Thus, petitioner's 200,000 shares were somewhat less than half of the total shares outstanding. We conclude, and we have found, that petitioner's basis in her Medi-Serv stock was in the amount of $ 31,493.30. Accordingly, we conclude that petitioner was entitled to a worthless stock deduction for 1977 in the amount of $ 31,493.30. See sec. 6214(b). However, our inquiry does not end at this point; 1977 is not before us in the instant case. The question remains, can petitioner use the $ 31,493.30 deduction in any of the years before us? We conclude that she can, subject to the limitations of section 1211(b), discussed below. Section 165(g)(1) *202 provides that when stock which is a capital asset becomes worthless, the resulting loss in a capital loss; whether it is long-term or short-term depends on what its holding period would be on the last day of the taxable year in which the stock became worthless. Because petitioner received her Medi-Serv stock in 1968, her capital loss is a long-term capital loss. Sec. 1222(4). The amount of the deduction allowable each year on account of the $ 31,493.30 long-term capital loss is to be calculated under Rule 155 subject to the limitations of sections 1211(b)(1) and 1212(b)(1). The allowable loss must be calculated both for the years before the Court and the income averaging base period years, because the loss deductions will affect petitioner's tax liabilities in years before the Court, both directly and through income averaging. We hold in general for petitioner on this issue. [14]
*203 B. Other Corporations
In her and her counsel's trial memoranda, petitioner argues that she is entitled to a 1974 worthless stock deduction with respect to her stock in 453 X-Ray and in PSGR Management Corp. At trial, petitioner stated that this stock became worthless in 1975. In her trial memorandum, petitioner seems to suggest that 1978 may be the appropriate year to recognize these losses. Also, in her trial memorandum, petitioner states as follows: 453 Holding Corporation was transferred to my ex-husband for the nominal amount of $ 1000. The basis has not been considered at this time. In fairness, I believe that loss should likewise be apportioned by way of a reserve established in 1978 for bad debts, and charged off periodically as ordinary loss under the tenets of 1244.
The record in the instant case does not support any finding that petitioner sustained any losses on any of the aforesaid stocks that would affect petitioner's income tax liabilities for any year before the Court. We hold for respondent on this issue. III. Bad Debts
Petitioner contends that she is entitled to either a business or a nonbusiness bad debt deduction for 1977 with respect *204 to loans to Medi-Serv, for 1974 with respect to loans to PSGR Management Corp. and 453 X-Ray, and for 1978 with respect to loans to Patsan Holding Corp. [15]
Respondent contends petitioner has failed to meet her burden of proving she is entitled to a bad debt deduction for any of the years in issue. She has failed to meet her burden of proving the amounts of any of the claimed loans, the year each loan became worthless, and the grounds upon which each loan became worthless. We agree with respondent. Section 166(a) allows deductions for worthless debts. However, under section 166(d)(1), a nonbusiness bad debt is *205 deductible by an individual only as a short-term capital loss. Under section 166(d)(2), petitioner's alleged debt from Medi-Serv would be a nonbusiness debt unless it had been acquired in connection with, or became worthless in, petitioner's trade or business. Whether a bona fide debt exists, whether the debt became worthless at all, and whether it became worthless in a year in issue, are all factual matters, as to which petitioner has the burden of proof. Caligiuri v. Commissioner, 549 F.2d 1155, 1157 (CA8 1977), affg. a Memorandum Opinion of this Court [16]; Matter of Uneco, Inc., 532 F.2d 1204, 1207 (CA8 1976); Continental Bankers Life Ins. Co. v. Commissioner, 93 T.C. 52, 66 (1989), on appeal (CA5 June 4, 1990); Dallmeyer v. Commissioner, 14 T.C. 1282, 1291 (1950). It is generally accepted that the year of worthlessness, of either stock or debts, is to be fixed by identifiable events which form the basis of reasonable grounds for abandoning any hopes of recovery. Crown v. Commissioner, 77 T.C. 582, 598 (1981); Scifo v. Commissioner, 68 T.C. at 725; Dallmeyer v. Commissioner, 14 T.C. at 1291-1292. *206 See Boehm v. Commissioner, 326 U.S. at 291-292. In regard to the alleged loans to Medi-Serv, the only evidence in the record which we have found or to which petitioner points us on this issue is an entry on Medi-Serv's final Federal corporate income tax return balance sheet showing "Loans from stockholders" in the amount of $ 21,775. It is unclear from the record, however, whether the loan was from petitioner or from Martin. Petitioner did not call as a witness the certified public accountant who prepared Medi-Serv's final corporate tax return. Medi-Serv's corporate books do not mention any loans from shareholders. On the record before us, we are not persuaded that (1) there was a loan, or (2) the loan (if any) was from petitioner. Petitioner has failed to carry her burden of proof on this issue. In regard to the alleged loans to the other corporations, petitioner did not introduce any evidence as to the existence of any such loans and when, if ever, *207 the alleged loans became worthless. [17] Petitioner has not carried her burden of proof on this issue. We hold for respondent on this issue. IV. Legal Fees
A. Divorce Suit
Petitioner contends as follows (1) she paid legal fees in 1977 and 1979 relating to her divorce suit against Martin in the amounts of $ 19,250 and $ 12,750, respectively (2) 80 percent of these fees were incurred for the production of income (3) she is entitled to deduct 80 percent of these legal fees under section 212 for 1977 and (4) her taxable income for 1977 and 1979 would be reduced, which would affect her tax liabilities for the years before the Court, through income averaging. Respondent does not directly *208 address the legal fees issue on brief; however, he does contend on brief that petitioner generally has failed to prove the requisite elements of any deductions for the years in issue. We agree, in large part, with respondent. Petitioner may deduct the amounts she paid to her attorney that are allocable to obtaining alimony includable in her gross income. Sec. 212(1); [18] *209 Hesse v. Commissioner, 60 T.C. 685, 693-694 (1973), affd. without published opinion 511 F.2d 1393 (CA3 1975); Wild v. Commissioner, 42 T.C. 706 (1964); Gale v. Commissioner, 13 T.C. 661, 666-669 (1949), affd. 191 F.2d 79 (CA2 1951); sec. 1.262-1(b)(7), Income Tax Regs. Amounts allocable to nontaxable aspects of the divorce proceedings are not deductible. Sec. 262.[19]LeMond v. Commissioner, 13 T.C. 670, 673-674 (1949); see also Gale v. Commissioner, 13 T.C. at 669. During the period 1977 through 1982, petitioner received taxable alimony income from Martin in annual amounts ranging between $ 17,200 and $ 28,500. (See table 1, supra.) In 1977, Martin paid $ 19,250 on behalf of petitioner for legal fees relating to the divorce. Some part of these fees are allocable to obtaining alimony includible in petitioner's income; that part is deductible. The next question is how much is so allocable. The First Decree, which ordered the payments to Moran, dealt with much more than the amount of taxable alimony. The First Decree also (1) granted petitioner's motion for divorce and denied Martin's motion, (2) provided custody and visitation rights as to Robert, (3) provided for disposition of the marital *210 home and allocated proceeds and expenses, (4) provided for Robert's and Gwendy's education and child support, (5) disposed of certain personalty, and (6) dealt with eight counterclaims by Martin (in addition to two counterclaims subsumed in the foregoing list). The record does not provide us with any clear basis for apportioning the total counsel payments. Yet, where (as in the instant case) petitioner has proven that respondent's determination is in error, "it may not reasonably be held that * * * [petitioner is] bound to pay a tax that confessedly * * * [she does] not owe, unless * * * [her] evidence was sufficient also to establish the correct amount that lawfully might be charged against * * * [her]." Helvering v. Taylor, 293 U.S. 507, 515, 79 L. Ed. 623, 55 S. Ct. 287 (1935). We are obligated to determine the amount of petitioner's allowable deduction. Cohan v. Commissioner, 39 F.2d 540, 544 (CA2 1930). See Commissioner v. Maresi, 156 F.2d 929, 931 (CA2 1946) ("The one sure way to do injustice * * * is to allow nothing whatever upon the excuse that we cannot tell how much to allow"); cf. Rudd v. Commissioner, 79 T.C. 225, 236-237 (1982). *211 Taking into account the many important issues dealt with in the proceedings for which Moran was paid, we conclude (and we have found) that 10 percent ($ 1,925) of the 1977 payments is allocable to Moran's services to produce taxable alimony to petitioner, and is deductible by petitioner. [20] The remainder has not been shown by petitioner to be deductible. [21]Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a).
*212 Petitioner has failed to show that any amounts were paid to Moran in 1979, or would be deductible by her if so paid. [22]
We hold, in large part, for respondent on this issue. [23]
*213 B. Corporate Litigation
Petitioner contends that (1) she paid a $ 5,000 retainer to Moran in 1982 relating to the corporate litigation, (2) 80 percent ($ 4,000) of the retainer was for the production of income, and (3) she is entitled to deduct 80 percent of the retainer in 1982 under section 212. Respondent does not directly address the legal fees issue on brief; however, he does contend on brief that petitioner generally has failed to prove the requisite elements of any deductions for the years in issue. We agree with respondent.
Table 2, supra, shows that for 1977 through 1982 petitioner deducted about $ 22,000 in legal and accounting fees, and about $ 16,000 in unreimbursed expenses, "to secure business interests". Petitioner has failed to show that she paid the claimed $ 5,000, that it was paid in 1982, that any portion of it was attributable to the corporate litigation, and that it was in addition to the amounts for which she had already claimed deductions. The same is true of the $ 5,500 for 1981 that she refers to in her separate trial memorandum. We hold for respondent on this issue. V. Other Deductions
In her separate trial memorandum, petitioner *214 contends that (1) she is entitled to deduct half of the real estate taxes and mortgage interest on the marital home from 1974 until mid-1981, and (2) she is entitled to deduct $ 5,000 per year for some period on account of the real estate taxes and mortgage interest of 453 Holding Corp., Dolmar Holding Corp., and Patsan Holding Corp. Petitioner has failed to carry her burden of proof as to any of these items for any relevant years. We hold for respondent on this issue. VI. Late Filing Additions to Tax
Although additions to tax under section 6651(a)(1) were determined and petitioned for 1978, 1981, and 1982, the parties' agreement as to the 1978 deficiency determination (see n.3, supra) eliminates the addition to tax for that year. We consider, first whether there was an extension of time to file petitioner's 1982 tax return, second whether petitioner's tax return for 1982 was timely filed, and third whether any late filing for 1981 or 1982 was due to reasonable cause and not due to willful neglect. A. Extension -- 1982 Tax Return
Petitioner contends that she filed a request for an extension of time to file her 1982 tax return. Respondent contends that petitioner *215 did not file such a request. We agree with petitioner. Section 6081(a)[24] authorizes respondent to grant extensions of time to file tax returns. Section 1.6081-4(a)(1), Income Tax Reg., provides procedures for automatic 4-month extensions of time to file income tax returns for 1982 and later. A 4-month automatic extension granted from April 15, 1983, would require that the tax return be filed on or before August 15, 1983, for it to be timely filed. Petitioner has the burden of proving that she filed for an extension of time to file her 1982 tax return. Rule 142(a). The notice of deficiency lists the deficiencies and additions to tax for 1978, 1981, and 1982. The amounts of the *216 additions to tax calculated for 1978 and 1981 are 25 percent of the deficiency determined for the respective year. However, the amount of the addition to tax calculated for 1982 is only 5 percent of the determined deficiency for 1982. To us, this indicates that the person who prepared the notice of deficiency (1) was familiar with the basic 5-percent-per-month approach of section 6651(a)(1), and (2) was alert to, and aware of, some reason to believe that the 1982 tax return was filed not more than 1 month late. The 1982 tax return was received by respondent on August 19, 1983. This would be not more than 1 month late only if there was an automatic 4-month extension in effect.
Respondent suggests that the most likely explanation for the notice of deficiency's determination of a 5-percent addition is "that perhaps someone just miscalculated it." Respondent's explanation is certainly possible. It requires the happenstance that, of all the possible errors in computation, the preparer of the notice of deficiency happened to make the only error that would have been consistent with a 4-month automatic extension. We believe (contrary to respondent) that that coincidence is less likely *217 than the likelihood that an automatic 4-month extension had been in effect.
Although the record in the instant case is very sparse, we conclude (and we have found) that petitioner filed a timely request for an automatic 4-month extension of time to file her 1982 tax return. We hold for petitioner on this issue. B. Timeliness of Filing--1982 Tax Return[25]
Petitioner contends that she timely filed her 1982 tax return. Respondent argues that petitioner did not timely file her 1982 tax return. We agree with respondent. Respondent's determinations as to matters of fact in the notice of deficiency are presumed to be correct, and petitioner has the burden of proving otherwise. Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Because the notice of deficiency *218 calculated the addition to tax for 1982 as 5 percent of the determined deficiency, respondent's implicit factual determinations are that (1) petitioner filed an automatic extension to August 15, 1983, to file her 1982 return, and (2) petitioner mailed her 1982 tax return after August 15, 1983. (See sec. 7502, relating to timely mailing as timely filing.) We have concluded, supra, that petitioner did file an extension for time to file her 1982 tax return. Petitioner now has the burden to overcome the presumption of correctness in respondent's notice of deficiency that she mailed her 1982 tax return after August 15, 1983. Petitioner's 1982 tax return shows "8/15/83" next to her signature and a partially inked "AUG 19, 1983" in respondent's "Received" stamp. August 15, 1983, was a Monday and was not a Statewide legal holiday in New York. See sec. 7503. (Petitioner's 1982 tax return shows a New York State address and respondent's Received stamp also shows a New York State address.) Petitioner did not present any documentary proof (such as a certified mail sender's receipt) of the date of mailing. She testified that, to the best of her recollection, the 1981 and 1982 tax returns *219 had been mailed in April 1983. We accept that petitioner was a truthful witness, in that she truthfully testified as to her best recollection. However, she did not offer any explanation of why she would have postdated her tax returns by some 4 months (i.e., her signatures on both tax returns were dated "8/15/83"). We believe her recollection to have been in error. We conclude that petitioner has failed to carry her burden of overcoming the presumption of correctness in respondent's determination. We hold for respondent on this issue. C. Reasonable Cause--1981 and 1982 Tax Returns
Petitioner contends in her trial memorandum that, with respect to 1981 and 1982, she relied "on advice of competent counsel regarding the effect of pending litigation on her obligation to file current income tax returns * * *." Respondent argues that petitioner has failed to show reasonable cause for her late filing for 1981 and 1982, and is accordingly liable for additions to tax under section 6651(a)(1) for 1981 and 1982. We agree with respondent. An addition to tax under section 6651(a)(1)[26] *221 is imposed in case of a failure to file a timely tax return, unless it is shown that that failure *220 is due to reasonable cause and not due to willful neglect. Petitioner has the burden of proving error in respondent's determination that such an addition to tax should be imposed against her. Funk v. Commissioner, 687 F.2d 264, 266 (CA8 1982), affg. a Memorandum Opinion of this Court [27]; Ehrlich v. Commissioner, 31 T.C. 536, 540 (1958). A good faith belief that one is not required to file a return does not constitute reasonable cause under section 6651(a)(1), unless bolstered by, for example, advice from competent tax counsel who has been informed of all the relevant facts. Stevens Bros. Foundation, Inc. v. Commissioner, 39 T.C. 93, 133 (1962), affd. on this point 324 F.2d 633, 646 (CA8 1963). Petitioner has failed to show what information she provided to her tax advisor, whether her tax advisor was a competent tax counsel, who her tax advisor was, exactly what tax advice she received, and when she received it. We note that petitioner's tax advisor did not testify. Also, although petitioner's tax returns for earlier years showed that they had been prepared by an accounting firm, her 1981 and 1982 tax returns do not have such a showing. We conclude that petitioner has failed to show that the late filings of her 1981 and 1982 tax returns were due to reasonable cause and not to willful neglect. We hold for respondent on this issue. [28]
*222 In order to take account of the foregoing, Decision will be entered under Rule 155. Footnotes
1. Petitioner prosecuted the instant case pro se until about 11 weeks before the trial, when she retained Frank W. Louis. Louis entered his appearance shortly thereafter. At the conclusion of the trial, the Court granted Louis' motion for leave to withdraw.↩
2. Unless indicated otherwise, all section and chapter references are to sections and chapters of the Internal Revenue Code of 1954 as in effect for the years in issue.↩
3. The parties agree that there is no deficiency or overpayment for 1978. (See n.4, infra.) We understand this to eliminate, also, the section 6651(a)(1)↩ addition to tax for that year. Nevertheless, some findings are made as to 1978, both because they illuminate the situation as to 1981 and 1982, and because petitioner claims the benefits of income averaging for the latter years (under pars. (2) and (3) of sec. 1302(c)). Sec. 6214(b).
4. The parties have stipulated that, although she did not claim it on her tax return, petitioner is entitled to deduct for 1978 the $ 10,535 excess alimony that petitioner was required to repay to Martin under the Second Decree, and which was offset against Martin's obligation to reimburse petitioner for Gwendy's educational expenses. The excess alimony had been included in petitioner's income for 1977 and 1978.↩
5. The $ 19,250 was in the form of two cashier's checks, in the amounts of $ 11,250 and $ 8,000, which had been withdrawn from an account in the name of petitioner in trust for one of her children. The First Decree had given half of that account to petitioner and the other half to Martin. The payments came from Martin's half.↩
6. The preliminary prospectus shows petitioner as owning only 160,000 shares. Consideration had been given to transferring 40,000 of petitioner's shares to petitioner's and Martin's children (10,000 shares to each child). However, the transfers to the children were not made.↩
7. Petitioner failed to file briefs, even though the Court had ordered two sets of simultaneous briefs. Our understanding of petitioner's positions is gleaned from the opening statement presented at the start of the trial by petitioner's then counsel (see n.1, supra↩), the opening statement presented by petitioner herself, and petitioner's comments from the witness stand during the course of the trial.
8. SEC. 71. ALIMONY AND SEPARATE MAINTENANCE PAYMENTS. (a) General Rule. -- (1) Decree of divorce or separate maintenance. -- If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of * * * a legal obligation which, obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation. [Sec. 71↩ was revised by sec. 422(a) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 795. This revision does not affect the instant case.]
9. T.C. Memo 1983-278↩.
10. The effects of income averaging on the years in issue are derivative, and depend on our determination as to the worthless stock deduction.↩
11. SEC. 165. LOSSES. * * * (f) Capital Losses. --Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212. (g) Worthless Securities. -- (1) General rule. --If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.↩
12. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure.↩
13. SEC. 165. LOSSES.
* * * (b) Amount of Deduction. --For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.↩
14. Petitioner's contentions, as set forth above, appear in her counsel's trial memorandum. In her own, separate trial memorandum, petitioner contends that her loss is ordinary, presumably under section 1244. No evidence has been presented to support this contention. We hold for respondent on this point. Petitioner also states in her own trial memorandum that -- it is my view that it is propitious to elect to take the ordinary loss by way of setting up a "loss" reserve as of the year 1977 and allotting this deduction incrementally beginning with that year, which is the final year of the corporate operation, through 1986, the year of the Agreement. This would effectuate a loss of approximately $ 5000 per annum. We are not aware of any tax law foundation for the course suggested by petitioner. The allowable deductions are to be calculated in accordance with the tax law.↩
15. In her separate trial memorandum, petitioner contends that she made loans aggregating $ 30,174.58 to Medi-Serv, 453 Holding Corp., Dolmar Holding Corp., and Patsan Holding Corp. Her proposed resolution of this issue is that that aggregate amount "should be likewise placed in a reserve for bad debt established in 1978 and extending until the Agreement of 1986 with a write off of $ 3,333. per annum."↩
16. T.C. Memo 1975-319↩.
17. Petitioner's cause was not helped by exchanges such as the following: THE COURT: Mrs. Feldman, when is it that you're claiming the Patsan debt became a bad debt? THE WITNESS: Well, Your Honor, I would like to claim it on any years that the I.R.S. says I have a liability, whether it's before this Court or not. * * *↩
18. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year -- (1) for the production or collection of income;↩
19. SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter [i.e., chapter 1], no deduction shall be allowed for personal, living, or family expenses. [The amendment made by sec. 5073(a) of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, 3682, does not affect the instant case.]↩
20. This 1977 deduction is to be taken into account in the Rule 155 computation for purposes of applying income averaging for the years before the Court. Sec. 6214(b).↩
21. Petitioner offered into evidence a letter dated December 2, 1987, from Moran to a lawyer who apparently had furnished petitioner with some assistance at an early point in the instant case. The letter stated that Moran's files showed that 70 percent of Moran's fees were for the production of taxable income and 10 percent for tax advice. Respondent objected on the ground of hearsay. Moran was not present, neither was the custodian of the files that Moran's letter purported to summarize. We sustained the objection. No other evidence was offered as to the allocation of Moran's fees.↩
22. The letter referred to in n.21, supra↩, also stated that Moran's files showed that he had received from petitioner in 1979 fees totalling $ 12,750, as well as the $ 19,250 received in 1977. We sustained respondent's objection to receipt of the letter. No other evidence was offered as to the asserted 1979 payments.
23. Martin paid petitioner's liability to Moran because the First Decree ordered Martin to do so. We have dealt with substantiation and allocation because these matters seemed to be the focus of the parties' attention during the proceedings in the instant case. Neither side has discussed whether petitioner's deduction is affected by the compulsion of the First Decree or the fact that Moran was paid by Martin, and we do not deal with those matters. See Martin v. Commissioner, 73 T.C. 255, 262↩ (1979), suggesting that a husband's payment of a wife's divorce-related attorneys' fees is "akin to a property settlement".
24. SEC. 6081. EXTENSION OF TIME FOR FILING RETURNS. (a) General Rule.--The Secretary may grant a reasonable extension of time for filing any return, declaration, statement, or other document required by this title or by regulations. Except in the case of taxpayers who are abroad, no such extension shall be for more than 6 months.↩
25. Petitioner does not dispute respondent's determination that she failed to file her 1981 tax return on time; her opposition to the addition to tax for 1981 is that she had reasonable cause for the late filing, discussed infra↩.
26. SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) Addition to the Tax.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate; * * * In the case of a failure to file a return of tax imposed by chapter 1 [relating to income taxes] within 60 days of the date prescribed for filing of such return (determined with regard to any extensions of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, the addition to tax under paragraph (1) shall not be less than the lesser of $ 100 or 100 percent of the amount required to be shown as tax on such return. [The final flush language applies to 1982, but not to petitioner's earlier years. (Sec. 318(c) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 610.)]↩
27. T.C. Memo 1981-506↩.
28. In the Rule 155 computation for 1982, the addition to tax is to be 5 percent of the deficiency, and the minimum amount provided by the flush language of section 6651(a) is not to apply (because the 1982 tax return was filed only 4 days after the prescribed filing date with regard to extensions of filing). In the Rule 155 computation for 1981, the addition to tax is to be 25 percent of the deficiency, and the minimum amount provided by the flush language of section 6651(a)↩ is not to apply (because the flush language does not apply to tax returns for periods ending before December 31, 1982).